**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COOLTVNETWORK.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-291-LPS-JLH |
| | ) | |
| BLACKBOARD INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| COOLTVNETWORK.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-292-LPS-JLH |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| COOLTVNETWORK.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-293-LPS-JLH |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| COOLTVNETWORK.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-294-LPS-JLH |
| | ) | |
| KALTURA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

COOLTVNETWORK.COM, INC.,    )
    )
        Plaintiff,    )
    )
    v.    )    C.A. No. 19-295-LPS-JLH
    )
LIMELIGHT NETWORKS, INC.,    )
    )
        Defendant.    )
_____ )
COOLTVNETWORK.COM, INC.,    )
    )
        Plaintiff,    )
    )
    v.    )    C.A. No. 19-296-LPS-JLH
    )
MICROSOFT CORP.,    )
    )
        Defendant.    )
_____ )
COOLTVNETWORK.COM, INC.,    )
    )
        Plaintiff,    )
    )
    v.    )    C.A. No. 19-297-LPS-JLH
    )
OOYALA, INC.,    )
    )
        Defendant.    )
_____ )
COOLTVNETWORK.COM, INC.,    )
    )
        Plaintiff,    )
    )
    v.    )    C.A. No. 19-534-LPS-JLH
    )
SNAP INC.,    )
    )
        Defendant.    )
_____ )

COOLTVNETWORK.COM, INC.,     )
                                       )
                Plaintiff,          )
                                       )
          v.                      )     C.A. No. 19-535-LPS-JLH
                                       )
TRAPELO CORP.,                )
                                       )
            Defendant.     )
_____ )

## <u>REPORT AND RECOMMENDATION</u>

Pending before the Court are the parties' claim construction disputes related to terms in United States Patent No. 7,162,696 (the "'696 Patent"). I held a *Markman* hearing on October 19, 2020. I recommend that the Court adopt the constructions as set forth below.

I recommend that the claim terms with agreed-upon constructions be construed as follows:

| | Term | Court |
|---|---|---|
| 1 | "tangible retaining medium"<br><br>Claims 1, 15, 17, 18 | "physical storage medium" |
| 2 | "entertainment mode"<br><br>Claims 1, 15, 17, 18 | "mode that allows the user to click a multifunctional hot spot that specifies a movie, video, or audio file related to the selected multifunctional hot spot" |
| 3 | "link mode"<br><br>Claims 1, 15, 17, 18 | "mode that allows the user to click a multifunctional hot spot that provides a hyperlink to a related or targeted web pages, object, or file" |

Further, as announced from the bench on October 23, 2020, I recommend that the following disputed claim terms be construed as follows:

| | Term | Court |
|---|---|---|
| 1 | "multifunctional hot spot apparatus"<br><br>Claims 1, 15, 17, 18 | "physical device that allows the user to interact with multifunctional hot spots" |
| 2 | "hot spot"/"Multifunctional Hot Spot"<br><br>Claims 1, 5, 15, 16, 17, 18 | "programmable hyperlink that performs one of multiple predetermined functions when selected by the user, depending on the current mode" |
| 3 | "means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot"/"performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot"<br><br>Claims 1, 15, 17, 18 | Indefinite. |
| 4 | "expandable graphical user interface bar"<br><br>Claims 1, 15, 17, 18 | "graphical user interface menu bar, which permits modes to be added to the bar and permits the user to expand the bar to select a mode" |
| 5 | "wherein the mode control comprises a plurality of modes"<br><br>Claims 1, 15, 17, 18 | "wherein the mode control comprises a plurality of modes that the user can switch between" |
| 6 | "mode control"<br><br>Claims 1, 15, 17, 18 | "graphical user interface menu bar, which permits modes to be added to the bar and permits the user to expand the bar to select a mode" |
| 7 | "shop mode"<br><br>Claims 1, 15, 17, 18 | "mode that allows the user to click a multifunctional hot spot to add item(s) for purchase to the user's shopping cart" |
| 8 | "bid mode"<br><br>Claims 1, 15, 17, 18 | "mode that allows the user to click a multifunctional hot spot to place a bid in an auction for products among multiple users in a multicast communication interface" |
| 9 | "interact mode"<br><br>Claims 1, 15, 17, 18 | "mode that facilitates interaction between the user and live-streamed internet programs" |

| 10 | "means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot"/ "selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot"<br><br>Claims 1, 15, 17, 18 | Indefinite. |

## I.      LEGAL STANDARDS

The purpose of the claim construction process is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments*, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  When the parties have an actual dispute regarding the proper scope of claim terms, their dispute must be resolved by the judge, not the jury.  *Id.* at 979.  The Court only needs to construe a claim term if there is a dispute over its meaning, and it only needs to be construed to the extent necessary to resolve the dispute.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

"[T]here is no magic formula or catechism for conducting claim construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005).  But there are guiding principles.  *Id.*

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."  *Id.* at 1313.  In some cases, the ordinary meaning of a claim term, as understood by a person of ordinary skill in the art, is readily apparent even to a lay person and requires "little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  Where the meaning is not readily apparent, however, the court may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*

"The claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  For example, "the context in which a term is used in the

asserted claim can be highly instructive." *Id.* Considering other, unasserted claims can also be helpful. *Id.* "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition, the "claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The specification "is always highly relevant to the claim construction analysis." *Id.* (quoting *Vitronics*, 90 F.3d at 1582). The specification may contain a special definition given to a claim term by the patentee, in which case, the patentee's lexicography governs. *Id.* at 1316. The specification may also reveal an intentional disclaimer or disavowal of claim scope. *Id.* However, "even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal marks omitted).

Courts should also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317. It may inform "the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* Statements made by a patentee or patent owner during inter partes review may also be considered. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017).

In appropriate cases, courts may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For example, dictionaries,

especially technical dictionaries, can be helpful resources during claim construction by providing

insight into commonly accepted meanings of a term to those of skill in the art. *Phillips*, 415 F.3d

at 1318. Expert testimony can also be useful "to ensure that the court's understanding of the

technical aspects of the patent is consistent with that of a person of skill in the art, or to establish

that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

*Id.*; *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).

## II. THE COURT'S RULING

My Report and Recommendation regarding the disputed claim terms of the '696 Patent

was announced from the bench on October 23, 2020:

> I am prepared to state my rulings on claim construction. . . .
> I will not be issuing a separate written Report and Recommendation,
> but I will issue a written Report and Recommendation that
> incorporates my oral rulings today. I want to emphasize before I
> announce my decisions that, while I'm not issuing a separate
> opinion, we have followed a full and thorough process before
> making the decisions I am about to state.
>
> I have carefully reviewed the patent-in-suit. There was also
> full briefing on each of the disputed terms. The parties submitted
> their claim construction brief in accordance with my procedures.
> Each side had the opportunity to submit two briefs, and they were
> combined into one joint claim construction brief incorporating all
> arguments. The parties' joint claim construction brief and joint
> claim chart also referenced numerous exhibits. Those exhibits
> included portions of the prosecution history relied on by the parties
> as well as certain extrinsic evidence.
>
> Neither party elected to put on live expert testimony.
> Defendants submitted an expert declaration regarding claim
> construction. The appendix to the parties' joint claim construction
> brief also includes an expert declaration from one of Plaintiff's
> experts that appears to have been originally prepared in support of
> Plaintiff's opposition to Defendants' earlier motions to dismiss. The
> pertinent portions of those declarations have also been considered.
> The Court also heard nearly three hours of oral argument at the
> *Markman* hearing on October 19, 2020.

All of that has been carefully considered.  And to be clear, while my oral ruling will cite to the intrinsic and extrinsic evidence that I conclude best supports my recommended constructions, my failure to cite to other evidence provided by the parties does not mean that I ignored or failed to consider it.  As I stated, I have considered all of the arguments and evidence cited by the parties.

I am not going to read into the record my understanding of the general legal principles of claim construction.  I set forth the legal standards in my opinion in *3Shape v. Align*, No. 18-886, 2020 WL 2188857 (D. Del. May 6, 2020), and I incorporate that articulation by reference.

Of course, a claim term is supposed to be given the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.  And I note here that neither side has argued that any difference the parties may have in defining one of ordinary skill in the art is material to how I should resolve the disputes before me today.  In other words, neither side is saying not to credit the other side's expert because they are not a person of ordinary skill in the art.

The disputed terms are found in the claims of U.S. Patent No. 7,162,696, entitled "Method and System for Creating, Using and Modifying Multifunctional Website Hot Spots."   The independent claims are claims 1, 15, 17, and 18.[1]

---

[1] Independent Claim 1 provides:

1. A Multifunctional Hot Spot apparatus comprising:

at least one hot spot defined by a communication with instructions stored on a tangible retaining medium;

at least one of the hot spots being accessible from a globally accessible network;

means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar,

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

The parties have agreed on the construction of a number of terms, and I recommend to Judge Stark that he adopt those agreed-upon constructions.

**[Means-plus-function limitations]**

I will first address the two means-plus-function disputes. The parties dispute whether the specification discloses corresponding structure for the two means-plus-function limitations in claim 1.

The parties agree on a number of things. They agree that the two claim limitations at issue employ means-plus-function language and are therefore subject to the requirements of 35 U.S.C. § 112 ¶ 6.[2]

The parties also agree that, for purposes of construing these means-plus-function limitations, the patent must disclose an algorithm in the specification that corresponds to the claimed function. That is in accordance with Federal Circuit law, as set forth, for example, in *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). That case states that "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'"[3] The specification can express the required algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

---

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

Independent Claims 15, 17, and 18 are similar to Claim 1 but are directed to "[a] tangible computer readable storage medium" (Claims 15 and 18) and "[a] Multifunctional Hot Spot method" (Claim 17).

[2] Currently codified at 35 U.S.C. § 112(f).

[3] *Aristocrat Techs.*, 521 F.3d at 1333 (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed.Cir.1999)).

However, if the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price for invoking § 112 ¶ 6.[4]  If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to "particularly point out and distinctly claim the invention" as required by § 112 ¶ 2.  Under 35 U.S.C. § 112 ¶ 2 and ¶ 6, therefore, "a means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311-12 (Fed. Cir. 2012).   A computer-implemented means-plus-function limitation is also indefinite if the specification does not disclose any corresponding algorithm.  *Triton Tech of Texas, LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

**["means for performing . . ."/"performing . . ."]**

The first means-plus-function limitation is "means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot."  That phrase is followed by a number of wherein clauses.

Plaintiff's proposed construction is set forth in the latest version of the joint claim chart.  Plaintiff asserts that the claimed function is "performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot."  Although there are a number of wherein clauses that follow the means for performing phrase, Plaintiff argues that they should not be considered in construing the claimed function.

In the joint claim chart, Plaintiff sets forth the following as corresponding structure:   "computer hardware and/or software operating according to the following disclosure" and then goes on to cite 20 lines of text from column 1, more than 40 lines from column 2, the entirety of column 3, almost all of the substance of column 4, 20 lines from column 5, all of column 6, 20 lines from columns 7 and 8, Figures 1A, 1B, 1C, 2A, 2B, 2C, two structures in Figure 3, and Figure 4.[5]  In sum, Plaintiff says that the corresponding

---

[4]  *Aristocrat Techs.*, 521 F.3d at 1333.

[5]  (*See* C.A. No. 19-291, D.I. 57 (Second Amended Joint Claim Construction Chart) at 8-11.)

structure is approximately 50% of the text of the patent and eight of the nine figures.

Defendants argue that the claimed function is "for each hot spot selected, performing at least one of a plurality of predetermined functions." Defendants further argue that construction of the claimed function should include the limitations set forth in the wherein clauses that follow the means for performing clause.

Defendants assert that, under either Plaintiff's or Defendants' proposed construction of the claimed function, the specification does not disclose sufficient structure to perform the function, rendering the phrase indefinite.

I agree with Defendants. I will accept solely for purposes of the argument that Plaintiff's construction of the claimed function is correct, since it has less detail than Defendants' proposed function. My logic for doing the analysis this way is this: if the specification fails to disclose sufficient structure to support Plaintiff's less-detailed proposed function, then it also fails to support Defendants' proposed function. That logic has support in the case law, for example, in Judge Bryson's opinion in the *Aristocrat Techs.* case.[6]

That said, the claim goes on to say what predetermined functions are required, namely, a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode. And, during oral argument, Plaintiff appeared to acknowledge that the means for performing required means for performing each of those modes.[7]

So, assuming for purposes of the argument that the claimed function is performing at least one of a plurality of those predetermined functions executed with the selection of each particular hot spot, I agree with Defendants that the specification does not disclose an algorithm for how to perform the function.

For example, the flow charts set forth in the figures disclose that, depending on the mode, clicking on a hot spot will activate one of the predetermined functions. But the claim calls for a means for performing one of the predetermined functions, not a means for determining which predetermined function to perform out of a

---

[6] 521 F.3d at 1332-1333.

[7] (C.A. No. 19-291, D.I. 61 ("Hr'g Tr.") at 54:24-55:1; *see also id.* at 49:15-22, 51:4-55:4, 55:9-18.)

plurality of predetermined functions. And nothing in the figures or specification describes how the claimed predetermined functions are performed. Consequently, they don't support the means for performing limitation.[8]

While I only need to look to the patent itself to conclude that the means for performing language is indefinite, I note that my conclusion is consistent with the declaration of Defendants' expert.[9]

In short, I agree with Defendants because Defendants' argument is right. And my analysis could end there. To complete the record, however, I note that Plaintiff's argument and Plaintiff's counsel's approach to claim construction are wrong.

As I already mentioned, Plaintiff, in each of the three joint claim charts filed with the court, proposed the corresponding structure as approximately 50% of the patent and eight of the nine figures. But much of the cited text and figures are unrelated to the claimed function, as counsel for Plaintiff acknowledged at the hearing.[10] Moreover, at the hearing, counsel represented that he would describe for the Court the "portions of this citation that are relevant" in order to "bring . . . into focus" the corresponding structure.[11] In this district, a *Markman* hearing is not the time to raise a new claim construction argument. New arguments made at a *Markman* hearing are waived.[12]

Regardless, Plaintiff's counsel didn't bring anything into focus at the *Markman* hearing with respect to this limitation.

Nor did Plaintiff's brief. The opening brief appeared to suggest that the corresponding structure for this limitation could be found in dependent claims 2, 3, and 13. Yet it cited no authority supporting [the] proposition [that dependent claims can supply the

---

[8] *See ePlus, Inc. v. Lawson Software*, *Inc.*, 700 F.3d 509, 518-20 (Fed. Cir. 2012).

[9] (*See* C.A. No. 19-291, D.I. 51 (Joint Appendix in Support of Claim Construction Brief ("J.A.")) at 061-69.)

[10] (Hr'g Tr. at 49:23-50:5.)

[11] (Hr'g Tr. at 48:9-14, 49:9-10.)

[12] *See, e.g., Watkins v. Int'l Union, Security, Police & Fire Professionals*, C.A. No. 15-444-LPS, 2016 WL 1166323, at *4 n.4 (D. Del. Mar. 23, 2016) (refusing to consider argument raised for the first time at a hearing and collecting cases).

required structure].   The closest that Plaintiff ever came to identifying a corresponding algorithm was in its reply brief.  There, it suggested that the corresponding structure is an "applet" as set forth in Figures 1A, 1B, 1C, 2A, 2B, and 2C.  But Plaintiff's reply brief then went on to confuse the argument by citing to Figure 3, which is an illustration of a user interface, not an algorithm.[13]

Regardless, an "applet" is not a specific algorithm.   An applet is a general word for an application, a computer program.  As Defendants point out, and Plaintiff hasn't disputed, an applet is a class of algorithms.  Where the patent uses the term applet, it is simply an abstraction that describes the function being performed. It does not constitute an algorithm supporting the means for performing limitation.[14]

Instead of identifying the specific structure that performs the claimed function, Plaintiff's briefing focused on its contention that a person of skill in the art would be able to code a program to perform the desired function.  Plaintiff essentially argued that the specification was enabling.

While "enablement of a device requires only the disclosure of sufficient information so that a person of ordinary skill in the art could make and use the device," disclosure of the corresponding structure as required by § 112 ¶ 6 "serves the very different purpose of limiting the scope of the claim to the particular structure disclosed, together with equivalents."[15]  Plaintiff's argument that the function is enabled does not save the means-plus-function term from being indefinite.[16]

To sum up, Plaintiff does not point to any algorithm that clearly corresponds to the claimed function.   And Plaintiff's inability to point to a specific algorithm in its proposed construction supports Defendants' argument that a person of skill in the art would

---

[13]   (*See* C.A. No. 19-291, D.I. 50 (Joint Claim Construction Brief) at 13-16, 25-29.)

[14]   *See Blackboard, Inc. v. Desire2Learn Inc.,* 574 F.3d 1371, 1382-83 (Fed. Cir. 2009); *see also Noah Sys.*, 675 F.3d at 1311-12.  This point is reinforced by the teaching in the specification that "a downloadable custom plug-in(s) may be used . . . instead of a Java applet." ('696 patent, 8:7-9.)

[15]   *Aristocrat Techs.*, 521 F.3d at 1336.

[16]   *Id.* at 1336-38; *Blackboard, Inc.*, 574 F.3d at 1385.

be unable to recognize the corresponding algorithm from the specification and link it to the function in the claim.

Accordingly, I reject Plaintiff's construction and I agree with Defendants that the means for performing phrase is indefinite.

Independent claims 15, 17, and 18 do not use means-plus-function language. But they each have a limitation very similar to the "means for performing" phrase in claim 1. Specifically, they require "performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot."

Defendants contend that those phrases should be interpreted the same way as the means for performing limitation in claim 1. In other words, Defendants argue that the performing limitations in the dependent claims should be treated as means-plus-function limitations and held indefinite.

Plaintiff's brief did not challenge Defendants' argument that the performing limitations in the other independent claims should rise and fall with the means for performing limitation in claim 1. Indeed, Plaintiff's brief suggested its agreement that those limitations be treated the same. Specifically, pages 28-29 of the joint brief sets forth Plaintiff's argument that the performing limitations are not indefinite "[f]or the same reasons" as the means for performing limitation.[17]

As I have concluded that "means for performing" in claim 1 is indefinite, I also therefore conclude that the "performing" phrases in claims 15, 17 and 18 are indefinite.

As those are all of the independent claims, I could stop there. To complete the record, however, I will set forth the remainder of the claim construction rulings and briefly set forth my rationale.

**["means for selecting and activating . . ."]**

The second means-plus-function limitation in claim 1 recites "means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot."

Plaintiff argues that the claimed function is "selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot." In the joint claim

---

[17] (*See* C.A. No. 19-291, D.I. 50 at 28-29.)

chart, Plaintiff points to the corresponding structure as the same 50% of the text of the patent and eight of the nine figures that it cited for the "means for performing" limitation, along with a few more lines of text.[18]

Defendants argue that the function is "selecting and activating at least one predetermined function by the user clicking on each particular Multifunctional Hot Spot."  Defendants further contend that the specification does not disclose corresponding structure to perform the function, rendering the phrase indefinite.

I will assume that Plaintiff's claimed function is correct for purposes of my analysis.  Again, my logic here is that, if the specification does not disclose structure for Plaintiff's proposed function, it would not disclose structure for Defendants' proposal.

The parties again agree that the language is means-plus-function language.  And the specification must disclose an algorithm that allows the computer to carry out the claimed functions of "selecting" and "activating."[19]

In its briefing, Plaintiff argues that the cited portions of the specification, "when read together, accurately convey structure, both in algorithm and prose, that serves to perform the function of 'selecting and activating.'"[20]  But the cited portions of the specification [in the joint claim chart] are the same portions on which Plaintiff relied to show the 'algorithm' corresponding to the means for performing.  Plaintiff never explains which of those portions describe the means for performing and which describe the means for selecting and activating.  It is thus impossible . . . to determine [from Plaintiff's papers] which portions correspond to which claimed function.  Here, again, Plaintiff's inability to point to corresponding structure in its proposed construction supports Defendants' argument that a person of ordinary skill in the art would be unable to recognize the corresponding structure from the specification and link it to the function in the claim.

Plaintiff's opening brief also points to certain dependent claims as providing the corresponding structure.  Not only did

---

[18]  (*See* C.A. No. 19-291, D.I. 57 at 14-15.)

[19]  *Aristocrat Techs.*, 521 F.3d at 1333.

[20]  (*See* C.A. No. 19-291, D.I. 50 at 56.)

Plaintiff provide no support for its position that a dependent claim can provide the required structure, none of the cited dependent claims contain an algorithm for selecting and activating. Plaintiff's reply brief said something different. There, Plaintiff suggested that the interface set forth in Figure 3 was the means for selecting and activating, including the buttons.

Then, at the *Markman* hearing, Plaintiff's counsel represented to the Court that "today we will show what the means for selecting and means for activating actually is. It is actually the cursor or click is the means for selecting, and the mode control is the means for activating."[21] That argument was made for the first time at oral argument. It is waived.

Even were it not waived, I'm unpersuaded that a POSITA would understand a mode control and click to be the corresponding structure for the means for selecting and activating. Indeed, the claim separately requires a mode control.

Regardless, at the *Markman* hearing, counsel proceeded to confound his own argument regarding the proposed structures by referring to separate user and software sides, each of which can [independently] perform the claimed functions.[22] Nevertheless, Plaintiff failed to point to an algorithm describing how the computer performs those functions.

In sum, Plaintiff's proposed construction does not identify the algorithm corresponding to the "means for selecting and activating" limitation of claim 1. Accordingly, I agree with Defendants that the limitation is indefinite.

---

[21] (Hr'g Tr. at 108:12-16.) When asked by the Court "why today is the day where you are going to 'actually' show what it is," counsel responded, "That would create a conflict between me and my client." (*Id.* at 108:17-109:1.)

[22] At the hearing, Plaintiff's counsel stated the following:
> And so really selecting and activating, you could read it a number of different ways. Selecting, you can say, okay, from the user's perspective it selects a hot spot, it selects the mode or predetermined function. But then from the system side, it selects and activates in the software. And so which is it? We can cite to both. If we cite to the system side, then we need to cite to a number of different places in the specification to show the means for activating, which would be the modes and what they do.

(Hr'g Tr. at 116:8-18.)

Plaintiff has made no [separate] argument with respect to the corresponding "selecting and activating" limitations set forth in independent claims 15, 17, and 18. Indeed, in the briefing, the parties grouped the "means for selecting and activating" limitation in claim 1 and the "selecting and activating" limitations [in claims 15, 17, and 18]. Accordingly, I also conclude that the "selecting and activating" limitations in claims 15, 17, and 18 are indefinite.

**["Multifunctional Hot Spot apparatus"]**

The next term is "Multifunctional Hot Spot apparatus."

Plaintiff seeks the construction "software and/or hardware device that allows interaction with multifunctional hot spots."

Defendants seek the construction "physical device that allows the user to interact with multifunctional hot spots."

The essence of this dispute is whether the term "apparatus" requires a physical device.

I agree with Defendants. Apparatus is a common word.[23] The ordinary and widely accepted meaning of an apparatus is that it is something physical.

The portions of the specification cited by Plaintiff are consistent with the ordinary meaning of an apparatus as being a physical device.[24] Plaintiff also cites to several portions of the specification that don't appear to have anything to do with the term apparatus.[25] Those portions of the specification are unhelpful.

My conclusion relies solely on the intrinsic evidence. But I note that my conclusion is consistent with the declaration of Defendants' expert, who opines that a person of skill in the art would have understood the term apparatus as requiring a physical

---

[23] *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

[24] (*See, e.g.*, '696 Patent at 3:65-4:16, 4:38-46.)

[25] (*See, e.g.*, *id.* at 2:18-27, 5:19-22, 5:57-6:25.)

apparatus.[26]   Defendants' expert also referred to various dictionary definitions that are consistent with his opinion.[27]

Accordingly, I recommend that the Court adopt Defendants' construction of "Multifunctional Hot Spot apparatus."

**["hot spot"/"multifunctional hot spot"]**

The next dispute is over two terms: "hot spot" and "multifunctional hot spot."  The parties agree that the terms "hot spot" and "multifunctional hot spot" should be given the same meaning.  They also agree that they should be construed, at least in part, to mean "a programmable hyperlink that performs one of multiple predetermined functions when selected."

Defendants request that the terms be construed to also require that the selection be done "by the user, depending on the current mode."

I agree with Defendants.

The essence of the dispute between the parties is Plaintiff's contention that the entity who selects the hot spot in claim 1 does not have to be the user who selects the specific mode.  Plaintiff's disagreement with Defendants' construction is that it requires "*the* user" to select the hyperlink.  Another portion of the claim requires that "the user" have the ability to change the mode.  According to Plaintiff, Defendants' construction improperly excludes a situation where the end user has no ability to change the mode.

Plaintiff also argues that the additional language proposed by Defendants would be confusing for the jury.  But Plaintiff doesn't explain why a juror would be confused.  Indeed, Plaintiff's own arguments in the briefing and at oral argument demonstrate that there is a dispute here that needs resolution so that the jury is not confused.  Plaintiff's arguments suggest that it intends to argue to the jury that "the user" who selects the mode does not need to be the same individual who selects or clicks on the hyperlink.

I conclude that Defendants' interpretation that the hyperlink is selected by "the user" is more consistent with the claims and the specification.

---

[26]   (*See* J.A. at 058-59.)

[27]   (*Id.*)

First, claim 1 indicates that the predetermined function is activated by selecting or clicking on the hot spot hyperlink. When the claim is read as a whole, the natural reading is that the hot spot hyperlink is selected by the user and that the function that is performed upon selecting the hyperlink depends on the mode the user has selected.

Second, the specification and figures explain that "the software monitors whether the user has switched modes" and "if the user clicks the hot spot, then the software determines what mode the user has selected."[28]   Indeed, the specification is replete with references to the user as the entity doing the mode selection and the clicking.[29]   All of this aligns with the patent's description of "the instant invention" as "giving the end user the ability to . . . control and change the response of multifunctional hot spots and hyperlinks on a website."[30]  Plaintiff requests [that I] construe the term broadly to read on hot spots for which the end-user has no ability to change the mode, but that is inconsistent with the claims and the specification, including the patentee's description of his own invention.

While this dispute can be resolved solely by reference to the intrinsic evidence, I also note my conclusion is consistent with the declaration of Defendants' expert.[31]

Accordingly, I recommend that the Court adopt Defendants' construction of "hot spot" and "multifunctional hot spot."

**["shop mode"]**

The next term I will discuss is "shop mode."

Plaintiff seeks the construction "mode that allows clicking a multifunctional hot spot to select items for purchase."   At the *Markman* hearing, Plaintiff also offered an alternate proposal: "mode that allows a user to select a multifunctional hot spot to facilitate shopping."

---

[28] ('696 Patent at 7:5-65.)

[29] (*See, e.g., id.* at 3:30-32, 4:49-55, 5:12-50, 7:5-65, 8:44-46, Fig. 1C at 130, Fig. 2B at 238, Fig. 2C at 258, 262, 266, and 270.)

[30] (*Id.* at 1:53-58.)

[31] (J.A. at 060-61.)

Defendants seek the construction "mode that allows the user to click a multifunctional hot spot to add item(s) for purchase to the user's shopping cart."

The parties agree that "shop mode" must allow clicking a multifunctional hot spot. The crux of the dispute is whether the term "shop mode" must allow the user to be able to add items for purchase to the user's shopping cart. Defendants say yes, because the term should not be construed broader than what the specification teaches. Defendants contend, and Plaintiff does not dispute, that the term "shop mode" is not a term of art, nor does it have a plain and ordinary meaning to one of ordinary skill.

According to the *Indacon, Inc. v. Facebook, Inc.* case, and related cases, a term that has no meaning to one of skill in the art "ordinarily cannot be construed broader than the disclosure in the specification." [32]

Here, as Defendants rightly point out, when the specification mentions "shop mode," it always does so with reference to the ability to add an item to the user's shopping cart.[33]

Plaintiff argues that nothing in the specification would require a user to add selected items to a shopping cart, but Defendants' construction doesn't require that [the user add the items]. It requires, consistent with the specification, functionality that allows the user to add the items to their cart.

Plaintiff also argued at the hearing that it would not make commercial sense for the invention to insert itself as the middleman in transactions by requiring users to add items to a shopping cart tied to the software of the invention. I'm aware of no principle of claim construction that requires the construction to make the most commercial sense. And Plaintiff points to nothing that would overcome the patentee's disclosure of the "shop mode" as permitting the user to add an item to the user's shopping cart.

Accordingly, I agree with Defendants.

**["bid mode"]**

I next turn to "bid mode."

---

[32] 824 F.3d 1352, 1357 (Fed. Cir. 2016).

[33] (*See, e.g.*, '696 Patent at 3:12-15, 5:12-14, 6:4-10, 7:49-51, 8:46-48.)

Plaintiff seeks the construction "mode that allows communication among multiple users in a multicast communication interface." Plaintiff also proposed a new construction at the *Markman* hearing that permits bidding and/or an auction but does not require bidding or an auction.

Defendants seek the construction "mode that allows the user to click a multifunctional hotspot to place a bid in an auction for products among multiple users in a multicast communication interface."

The crux of the dispute is whether the "bid mode" requires an auction or a bid.

Here, again, Defendants argue, and Plaintiff does not dispute, that "bid mode" does not have a plain, ordinary, or customary meaning. Accordingly, under *Indacon*, it should not be construed broader than the disclosure in the specification.

Defendants correctly point out that all references to the "bid mode" in the specification require [functionality] allowing a user to place bids in an auction.[34] Plaintiff points to other portions of the specification that describe the bid mode having additional functions to bidding.[35] But all of those portions also refer to bidding or auction functionality.

Plaintiff's construction does not require bidding or an auction. That is inappropriate.

Accordingly, I reject Plaintiff's construction and I recommend that the Court adopt Defendants' construction.

**["interact mode"]**

The next term is "interact mode."

Plaintiff seeks the construction "mode allowing for communication between users and/or moderators."

Defendants seek the construction "mode that facilitates interaction between the user and live-streamed internet programs."

Defendants contend, and Plaintiff does not dispute, that "interact mode" has no plain, ordinary, or customary meaning.

---

[34] (*See, e.g.*, '696 Patent at 3:20-25, 8:53-56, Fig. 1B at 113, 114, Fig. 2B at 250, Abstract.)

[35] (*See, id.* at 3:20-25, 5:22-32, 6:51-7:8, Fig. 1B at 113.)

Accordingly, under *Indacon*, "interact mode" should be construed no more broadly than what is disclosed in the specification.

Every mention of interact mode in the specification, including the portion cited by Plaintiff, teaches that the interact mode facilitates interaction between the user and live-streamed internet programs.[36]  While the specification discloses that the interact mode can also have additional functionality, it is always described as having the functionality of the user interacting with live-streamed programs.

I also note that Plaintiff's construction refers to communications with "moderators," but the patent says nothing about moderators.

Accordingly, I reject Plaintiff's construction and recommend that the Court adopt Defendants' construction.

**["expandable graphical user interface bar"/"mode control"]**

Next is another dispute over two terms: "expandable graphical user interface bar" and "mode control."  The parties now agree that these terms should be given the same meaning.[37]  As the specification and prosecution history use the terms interchangeably, I agree that it is appropriate to construe them the same way.

Plaintiff seeks the construction "graphical user interface bar configured to expand for the support of additional functions, relationships, actions, or links."

Defendants seek the construction "graphical user interface menu bar which permits modes to be added to the bar and the user to scroll through the bar to select a mode."

The parties dispute (1) whether the limitations must allow for the addition of "modes" or whether it is sufficient to allow the addition of "functions, relationships, actions, or links," and (2) whether the requirement that the bar be "expandable" means that it has to have a scrolling capability.

---

[36]  (*See, e.g.*, '696 Patent at 3:24-25, 5:32-43.)

[37]  Plaintiff waived its separate argument about "mode control," which Plaintiff's counsel raised for the first time at the *Markman* hearing after conceding in the joint claim construction brief (C.A. No. 19-291, D.I. 50 at 37) and at oral argument (Hr'g Tr. at 77:6-15) that these two terms have the same meaning.

As to the former, I don't think the parties even dispute that additional "functions, relationships, actions, or links" can be added to the mode control by adding modes to the mode control. But it is clear from the specification—even the portion cited by Plaintiff—that the "expandable graphical user interface bar" and "mode control" must permit the addition of modes.[38]

Plaintiff suggests that dependent claim 16 is relevant to resolving this dispute, but that claim says nothing about a mode control or a graphical user interface bar.

I accordingly agree with Defendants' construction as it pertains to the capability for adding additional modes.

As to whether the "expandable graphical user interface bar" has to employ scrolling as proposed by Defendants or whether it can include some other way of expanding as argued by Plaintiff, I think it's a close case. For this discrete portion of the dispute, I disagree with Defendants. I recognize that a scroll bar is the only way the patent teaches to have the claimed expandable functionality. However, saying that "expandable" requires a particular scrolling, in my view, falls on the line of importing limitations from the specification into the claims.

Accordingly, I recommend that the Court construe the two terms the same, as agreed by the parties. I recommend that the Court construe the terms as a "graphical user interface menu bar, which permits modes to be added to the bar and permits the user to expand the bar to select a mode."

**["wherein the mode control contains a plurality of modes"]**

The last dispute is over the phrase "wherein the mode control contains a plurality of modes."

In the joint claim chart, Plaintiff sought the construction "wherein the mode control comprises a plurality of modes that the user can select."[39]

Plaintiff shifted course in its opening brief and argued that "[t]here is no reason to construe this simple phrase."[40] Then, at oral

---

[38] (*See* '696 Patent at 3:3-12, 3:33-47, 4:49-55, 5:8-11, 6:21-25, Fig. 3 at 93, 94.)

[39] (C.A. No. 19-291, D.I. 57 at 11-12.)

[40] (C.A. No. 19-291, D.I. 50 at 39.)

argument, Plaintiff reversed course again and reasserted the proposed construction set forth in the joint claim construction chart.[41]

Defendants seek the construction "wherein the mode control comprises a plurality of modes that the user can switch between."

As far as I can tell, part of this dispute relates to the earlier dispute over the construction of multifunctional hotspot. Both sides' proposed constructions refer to how a user interacts with the plurality of modes. Defendants seek a construction that makes clear that the end user must have the ability to switch between the plurality of modes in the mode control. Plaintiff seeks a construction that would cover a system in which the end user has no ability to switch between modes.

As between the two proposed constructions, I recommend Defendants' construction. Defendants point to various parts of the specification and the figures that disclose that it is the user who switches between the modes. For example, Figure 1B at 115 and 118 asks, "Has the user switched Modes?" Similar functionality is revealed by Figure 2C, which asks at 256, "Did the user click in the control bar?" and subsequently asks whether the user clicked on the various modes.[42] The specification also discloses that the mode control is displayed to and receives input from the user.

The detailed description of the invention further teaches that "[t]hroughout, the software 100 monitors whether the user has switched modes."[43] Plaintiff contends that hot spots could be configured to perform multiple modes at a single time. Defendants do not dispute that a single mode could perform multiple functions. But Defendants point out that the specification does not describe more than one mode being active at the same time. Regardless, Plaintiff does not explain how his argument about multiple modes being active at the same time resolves the parties' dispute, which is whether the end user must have the ability to switch between the modes. I agree with Defendants that it must.

---

[41] (Hr'g Tr. at 70:6-13.)

[42] (*See also* '696 Patent, Fig. 2C at 256, 258, 262, 266, 270.)

[43] (*Id.* at 7:5-6; *see also id.* at 7:44-46, 8:26-28, 9:9-11.)

Accordingly, I recommend that the Court reject Plaintiff's construction and adopt Defendants' construction.

*      *      *

I believe that takes care of all of the disputed terms, but before I conclude my Report and Recommendation, I want to state for the record that my rulings rejecting Plaintiff's positions were based on my understanding of its positions. But Plaintiff's counsel often made his positions difficult to figure out, and I want to give three examples.

First, one of the biggest challenges in this proceeding was cutting through the noise created by counsel's citations to broad swaths of the specification in support of his proposed constructions. But his citations were often irrelevant to the terms under construction, as [he] admitted at the hearing.[44]

Second, Plaintiff's positions often shifted between the joint claim chart, the briefing, and the hearing. This constant goalpost shifting made it difficult to pin down exactly what Plaintiff's arguments were. Counsel also waited until the hearing to raise several new arguments. It was evident that those positions had for the most part not been disclosed to Defendants before they were proffered in open court.

Third, counsel's briefing and argument were nowhere near models of clarity. Indeed, Plaintiff's brief cited a standard from a 2014 Federal Circuit case that was expressly overruled in 2015. Counsel proceeded to proffer that same overruled standard in open court during the *Markman* hearing, notwithstanding the fact that Defendants' brief pointed out his error.[45]

That concludes my report and recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to

---

[44]   (*See, e.g.*, Hr'g Tr. at 49:23-50:5.)

[45]   (C.A. No. 19-291, D.I. 50 at 26, 29 n.15; Hr'g Tr. at 63:19-64:20.)

ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages.
The failure of a party to object to legal conclusions may result in the loss of the right to *de novo*
review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R.
Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.


Dated:  November 6, 2020                        _____
                                                The Honorable Jennifer L. Hall
                                                United States Magistrate Judge